PENGAD 800-631-6989

PLAINTIFF'S
EXHIBIT
7.

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF ALABAMA

3              NORTHERN DIVISION

4


5    **ROBINA JENKINS,**

6           Plaintiff,
                              CIVIL ACTION
7         VS.
                              FILE NO. 2:05-CV-1049-C
8

9    **NANCY WORLEY,** individually and
     in her official capacity as
     Secretary of State, State of
10   Alabama; **JOE DICKSON,** individually
     and in his official capacity as
11   a member of the State Personnel
     Board, et al.
12
            Defendants.
13

14                                    **COPY**

15           *        *        *        *        *

16

17           DEPOSITION OF **NANCY WORLEY,** taken on

18   behalf of the Plaintiff, pursuant to the

19   stipulations set forth herein, before Jeana S.

20   Boggs, Certified Court Reporter and Notary Public,

21   at the offices of James E. Wilson, Jr. 732 Carter

22   Hill Road, Montgomery, Alabama, commencing at

23   approximately 10:00 a.m., Monday, January 28, 2008.

```
 1                APPEARANCES OF COUNSEL

 2   FOR THE PLAINTIFF:

 3          HONORABLE JAMES E. WILSON, JR.

 4          Attorney At Law

 5          732 Carter Hill Road

 6          Montgomery, Alabama  36106

 7          334.834.9899

 8   FOR THE DEFENDANTS:

 9          HONORABLE ALICE ANN BYRNE

10          Attorney At Law

11          STATE OF ALABAMA PERSONNEL DEPARTMENT

12          Legal Division

13          64 North Union Street, Suite 316

14          Montgomery, Alabama  36104

15          334.353.4481

16                      * * *

17

18

19

20

21

22

23
```

```
 1        political positions or political appointed

 2        positions?

 3    A   Yes.  I was elected vice-chair of the

 4        Alabama Democratic Party in 2007.

 5    Q   Okay.  Now, as vice-chair of the Democratic

 6        Party, exactly what do you do?

 7    A   As vice-chair of the party, I do whatever

 8        they need me to do, including traveling to

 9        some counties to work with elections or with

10        officers, including making telephone calls,

11        including generally paperwork and serving on

12        the Democratic National Committee.  And last

13        week, I tried to find a house for somebody

14        who was coming into Alabama to work on a

15        campaign.  It's a variety of --

16    Q   I hear you.

17    A   -- job responsibilities.

18                    (At which time, there was an

19                    off-the-record discussion.)

20    Q   What year were you elected, let's see,

21        Secretary of State?

22    A   I was elected in November of 2002.

23    Q   Okay.  And you actually took office -- when
```

```
1          were you actually, I guess, installed in the

2          office?

3   A      I took office in January of 2003.

4   Q      Okay.  Upon assuming the office of -- What

5          did you first do?

6              MS. BYRNE:  Object to the form.

7   Q      Well, let me ask the question a different

8          way.

9                   After being installed in the

10         office, did you participate in any

11         orientation, sessions, or anything like

12         that, to familiarize yourself with the

13         Secretary of State's office?

14  A      Mr. Wilson, I was given a 15-to-30-minute

15         orientation by my predecessor on the Friday

16         before I went in office on Monday.

17  Q      If I recall, were there some tensions that

18         existed between you and the predecessor in

19         office?

20             MS. BYRNE:  I am going to object to the

21                 form.

22  A      I had run against?

23  Q      No.  If you can --
```

1      appoints.

2  Q   Okay.  All right.  Which two positions were

3      those?

4  A   Mr. Wilson, I believe the Code refers to

5      those positions as a confidential secretary

6      and a -- and an administrative assistant --

7  Q   Right.

8  A   -- I believe are the titles given to them.

9  Q   I see.  Did you at some point after assuming

10      office also familiarize yourself with the

11      Merit System Act?

12  A   I did review the merit system generally, but

13      consulted with attorneys on the intricacies

14      of that law.

15  Q   Okay.  Do you recall who the attorneys were

16      in the office or assigned to the office at

17      the time you assumed it?

18  A   When I assumed office in January of 2003,

19      the attorney was Chuck or Charles Grainger.

20  Q   Okay.  Now, at some point after you assumed

21      office, there were, I guess, a law or

22      something requiring some budget cuts.  Do

23      you recall that?

```
1        2003-2004 fiscal year?
2    A   I would have to do my math to multiple the
3        18 percent times the budgeted amount, but I
4        suspect that it's probably about that
5        amount.
6    Q   Okay.  Let me just have you --
7            MS. BYRNE:  I am going to object to her
8                doing calculations here.  That's
9                ridiculous.
10   Q   Could you check and see if it appears to be
11       about an 18 percent cut from the budget for
12       the 2003-2004 fiscal year?  I tell you what,
13       let me come back to that.  Let's develop
14       some other stuff first, and I will come back
15       to that.
16           Now, are you generally familiar
17       with the Rules of the State Personnel Board
18       for the State of Alabama?
19           MS. BYRNE:  Object to the form.  Asked
20                and answered.  Go ahead and answer
21                again.
22   A   I am generally familiar with the Rules but
23       not with specific details.  I relied on the
```

```
 1        reasons, that the appointing authority, or

 2        the Secretary of State in this situation,

 3        would have to submit a layoff plan to the

 4        State Personnel Department?

 5   A    I was told that I had to submit a layoff

 6        plan to the -- to the State Personnel Board.

 7   Q    Okay.  And do you recall who would have told

 8        you that you needed to do that?

 9            MS. BYRNE:  I am going to object to any

10                communications between you and

11                your lawyers, but if it's somebody

12                else...

13   A    Mr. Wilson, I don't exactly remember who

14        told me exactly that I had -- I received a

15        letter asking me to submit a plan, a savings

16        plan, I think, based on the budget.  And I

17        think any layoff of personnel would have to

18        go to the State Personnel Board.

19   Q    Okay.  Let me ask you to turn to page 49 of

20        those Rules.  This chapter of the Rules is

21        entitled "Separation from Service," and

22        Section 670X-18.01 is identified as

23        "Layoffs."  Let me direct your attention to
```

```
 1        paragraph two.  Well, let's go back to

 2        paragraph one.  "An appointing authority may

 3        lay off an employee whenever it is deemed

 4        necessary by reason of shortage of work

 5        funds, or the abolition of a position or

 6        other material change in duties or

 7        organization."  In the case we have, the

 8        State could pass the law which requires

 9        layoffs because of the shortage of funds.

10        Paragraph two indicates that, "The

11        appointing authority shall submit a plan for

12        the layoffs to the State Personnel Director,

13        where possible at least fifteen (15) working

14        days in advance of the effective date, who

15        shall review the plan to ensure that."

16             Now, do you recall whether you

17        reviewed these Rules prior to submitting the

18        plan that -- the layoff plan to the State

19        Personnel Director in this case?

20   A    As I recall, the attorneys and I reviewed

21        the Rules.

22   Q    Okay.  Now, let me back up to what we have

23        identified as Plaintiff's Exhibit Two.  Is
```

```
 1   A    That is correct.
 2   Q    Do you recall what Attorney Grainger's
 3        salary was at this time?
 4   A    His salary was approximately $100,000.
 5   Q    $100,000?
 6   A    Yes, sir.  That may be salary and benefits
 7        together.
 8   Q    And I believe you testified he was in office
 9        when you assumed it; is that correct?  When
10        you assumed the Secretary of State's office,
11        he was already there; is that what I
12        understand?
13   A    Mr. Grainger was the attorney three in that
14        office when I came to that office.
15   Q    Uh-huh (positive response).  Now, what, if
16        anything, happened with Mr. Grainger after
17        submitting this budget plan, which is
18        identified as Plaintiff's Exhibit Two?
19   A    Mr. Grainger was terminated after the
20        submission of this.
21   Q    Now, after -- Let me back up and let me ask
22        you this:  When, if you recall, was Trey
23        Granger appointed to your office?
```

1           MS. BYRNE:  Object to the form.  Answer

2                if you can.

3  Q   Do you want me to rephrase the question?

4  A   He brought an attorney's ability to read the

5      Code and interpret the Code and the Rules as

6      any attorney I think would.

7  Q   I got you.  Now, your plan also indicates

8      that in paragraph five the layoff of the

9      supervisor of voter registration for an

10     approximate savings of $65,000.  Was there a

11     problem with this recommended layoff

12     identified to you by the State Personnel

13     Director?

14  A   The State Personnel Board did, in fact, tell

15     either Mr. Granger or Mrs. Swedenburg or

16     maybe both that the position of supervisor

17     of voter registration had been created by

18     the Legislature, and there was a problem

19     with that particular area of layoff plan.

20  Q   Let me show you what I am going to mark as

21     Plaintiff's Exhibit Six and ask you can you

22     identify that document for me, please.

23          (At which time, the

1   Q   Paragraph three.

2   A   Paragraph three from Mrs. Jackie Graham

3       says, "In response to your request to lay

4       off the employee in the classification of

5       Supervisor of Voter Registration, class code

6       11972, we are uncertain of our authority to

7       approve a layoff plan which includes a

8       position that is statutorily mandated and

9       required by law to carry out specific

10      statutory functions.  As such, an opinion

11      request has been made to the Attorney

12      General's office to address whether the

13      Supervisor of Voter Registration is subject

14      to a layoff plan."

15  Q   Okay.  Now, in light of that concern

16      regarding the supervisor of voter

17      registration and the issue regarding Mr. --

18      Attorney Grainger, it would appear that the

19      savings that you have proposed in

20      Plaintiff's Exhibit Two of the $228,000 plus

21      would not be realized; is that correct?

22  A   It is correct that the total amount of money

23      would not -- if those two areas were

```
 1        changed, the total amount of money would not
 2        be correct as to savings.
 3   Q    Okay.  Let me show you what I will identify
 4        as Plaintiff's Exhibit Seven and ask you if
 5        you can identify that document, please,
 6        ma'am.
 7                       (At which time, the
 8                       referred-to document was
 9                       marked as Plaintiff's Exhibit
10                       No. 7.)
11   Q    Are you able to identify that document,
12        please, ma'am?
13   A    This is a letter written October 15th, 2003,
14        by Attorney Trey Granger concerning those
15        two positions on the layoff plan.
16   Q    Okay.  In paragraph one it indicates that --
17        Well, let me just read it and let me
18        paraphrase what you are saying.  "Pursuant
19        to our conversation this morning with Alice
20        Ann Byrne, I am writing to confirm Secretary
21        Worley's decision to modify her pending
22        layoff plan.  Such a modification will
23        require the proposed layoff plan be
```

1    administered in phases.  Secretary Worley

2    will forward to you official notification of

3    her advised plan; however, I have been

4    authorized to notify you of her current

5    position.  Accordingly, please accept this

6    correspondence as confirmation of her intent

7    to postpone any action regarding the

8    Supervisor of Voter Registration as it

9    relates to the pending layoff plan."

10           Now, do you recall ever submitting

11    a modified or revised plan to the State

12    personnel?

13  A    I do not recall submitting that.

14  Q    And the reference to the proposed layoff

15    plan being administered in phases, could you

16    explain that reference to me, what was meant

17    by that, if you know?

18  A    Those are not my words.  Those are Attorney

19    Trey Granger's words.  So, I would prefer

20    not to interpret his term "phases."

21  Q    Okay.  I believe the exhibits -- I believe

22    Plaintiff's Exhibit -- this is Six, which is

23    the October 10th correspondence from Jackie

```
 1   Q   Does paragraph three refer to the Plaintiff

 2       in this case?

 3           MS. BYRNE:  Object to the form.

 4   A   It refers to a department program manager's

 5       position.

 6   Q   Was that -- Did the Plaintiff hold a

 7       departmental program manager's position?

 8   A   There were two people who held that

 9       position.

10   Q   Okay.  And the Plaintiff was laid off; is

11       that correct?

12   A   Mrs. Jenkins was the person, according to

13       the formula, who was laid off.

14   Q   Okay.  So, when we see paragraph three

15       reference to abolish one departmental

16       program manager's position, we are referring

17       to the Plaintiff's position, right?

18           MS. BYRNE:  Object to the form.

19   A   It is about a department program manager's

20       position.

21   Q   Okay.  Now, do you recall advising the

22       Plaintiff that because of budget cuts she

23       was going to be laid off?
```

1      went over and got those evaluations and put

2      them on this sheet or if someone in State

3      Personnel put those numbers on this sheet.

4   Q   Okay.  Page one indicates -- purports to be

5      a document regarding Sharon Frith and

6      indicates an efficiency rating of 95

7      percent; is that correct?

8   A   That is correct.

9   Q   Okay.  And page two purports to be a

10     document on Robina Wilson as well as Sharon

11     Frith, but it indicates an efficiency rating

12     of -- for Mrs. Wilson, Jenkins-Wilson, of

13     93.07 percent; is that correct?

14  A   That is correct.

15  Q   Okay.  And to the best of your knowledge,

16     was this efficiency rating used in

17     determining which of your departmental

18     program managers would be laid off?

19  A   In accordance with personnel rules, these --

20     this formula was used.

21  Q   Okay.  Now, subsequent to the layoff of

22     Mrs. Jenkins, did you appoint anyone to --

23     as an acting director of the corporate

```
 1      division?

 2            MS. BYRNE:  Object to the form.

 3   A    I did not officially appoint anyone.  But I

 4        did ask Ms. Viox to assume the duties of

 5        taking up leave slips and turning in

 6        evaluations and those kinds of

 7        responsibilities.

 8   Q    Let me show you what I am going to mark as

 9        Plaintiff's Exhibit Ten.  Do you recall

10        whether there were any -- First of all, can

11        you identify what that is?

12                        (At which time, the

13                         referred-to document was

14                         marked as Plaintiff's Exhibit

15                         No. 10.)

16   A    This is a business card from Ms. Viox.

17   Q    Okay.  And what is indicated on that,

18        please, ma'am?  What is her title?

19   A    It says, "Sharon Viox, Acting Director,

20        Corporate Division."

21   Q    Okay.  Now, who was responsible for

22        generating that business card for Ms. Viox?

23   A    I remember asking our personnel director to
```

```
 1       get some business cards for our employees.

 2       And I certainly authorized the purchase of

 3       those cards.  Mrs. Nelson went around to the

 4       employees and got the information for them.

 5   Q   So -- Well, first of all, let me ask you

 6       this:  When was this -- I think you used

 7       informal appointment made -- is that the

 8       term you used?  I don't want to

 9       mischaracterize what you said.

10           MS. BYRNE:  I am going to object to the

11               form.

12   Q   You know, I don't want to say anything that

13       you didn't say.  But, first of all,

14       characterize the appointment for me again so

15       I can use the correct phraseology.

16           MS. BYRNE:  And I am going to object to

17               the form.  Go ahead.

18   A   I didn't -- I did not make any official

19       appointment.

20   Q   Okay.

21   A   But I did ask an employee in that office to

22       assume the responsibilities of taking up

23       leave slips and doing evaluations and making
```

1    jobs got done.  I do recall Mrs. Swedenburg

2    telling me that Mrs. Viox had the most

3    knowledge of anyone over there in

4    corporations --

5  Q   Okay.

6  A   -- about corporate matters.

7  Q   Do you recall the conversation that you had

8    with Ms. Viox about this acting appointment?

9       MS. BYRNE:  Object to the form.

10  Q   And about assuming this position, let me put

11    it that way.

12  A   I recall vaguely talking to Ms. Viox about

13    some added responsibilities.  And I am sure

14    I went over those things such as evaluations

15    and taking up leave slips and scheduling

16    vacations and whatever.

17  Q   Okay.  Is it a fair characterization to say

18    that Ms. Viox assumed responsibilities that

19    the Plaintiff had as the departmental

20    program manager?

21  A   I believe that Ms. Viox carried out those

22    responsibilities of taking up leave slips,

23    scheduling vacations, and conducting

```
 1        evaluations.

 2   Q    Okay.  Do you have any independent

 3        recollection now how many persons were in

 4        the -- I guess that would be the corporate

 5        division?

 6   A    The bulk of the employees in the Secretary

 7        of State's office were in the corporate and

 8        UCC divisions.  But I do not have an exact

 9        number.

10   Q    Okay.  What was Ms. Viox's classification in

11        State service at the time?

12   A    I think she was an ASA-3.

13   Q    Now, did you notify State Personnel

14        regarding this -- regarding Ms. Viox

15        assuming this position?

16             MS. BYRNE:  Again, I am going to object

17                  to the form.

18   A    No, I didn't -- I didn't appoint her to

19        anything, so I didn't notify State Personnel

20        about her added responsibilities.

21   Q    This request of Ms. Viox to assume this

22        position, was it reduced to writing?

23             MS. BYRNE:  I am going to object to the
```

```
 1                 form.   Just off the record.

 2                         (At which time, there was an

 3                         off-the-record discussion.)

 4    A    I don't believe that I ever wrote her any

 5         kind of letter telling her that she had

 6         these added responsibilities.

 7    Q    Okay.  Now, what authority do you cite for

 8         giving you the authority to appoint -- I'm

 9         sorry -- asking Ms. Viox to assume the

10         responsibilities of this position?

11    A    I cite no authority whatsoever.

12    Q    Are you aware of any rule of the State

13         Personnel Board which gives you the

14         authority to ask Ms. Viox to assume this

15         position?

16             MS. BYRNE:  Object to the form.

17    A    I can't cite a specific rule that tells me I

18         can give -- I can or can't give her added

19         responsibilities and duties.

20    Q    Are you aware of any State law which gave

21         you the authority to ask Ms. Viox to assume

22         this position?

23             MS. BYRNE:  Object to the form.
```

1  A    I don't know of any State law that told me

2       to give her or not to give her added

3       responsibilities; however, State law, I am

4       sure, told me I had to get the job done.

5       So, I gave those added responsibilities in

6       that regard.

7  Q    Okay.  Now, let me ask you to look at the

8       Rules of the State Personnel Board, which is

9       Plaintiff's Exhibit Three, and let me ask

10      you to look at page four.  This is under

11      Rules 670-X-3-.01 (b), "Kinds of

12      Appointments."  The Rules set forth kinds of

13      appointments:  A regular appointment, a

14      temporary appointment, or a provisional

15      appointment.  Isn't it a fact that Ms. Viox

16      did not assume the duties of this position

17      under any of these appointments delineated

18      in this particular section?

19  A    Ms. Viox was never given any official

20      appointment that went through State

21      Personnel.

22  Q    Okay.  All right.  All right.  Let me ask

23      you to look at page 31 of the State Rules.

| | | |
|---|---|---|
| 1 | | provided, however, the person who refuses |
| 2 | | offers of reemployment shall forfeit such |
| 3 | | rights to subsequent placements as provided |
| 4 | | under Rule 670-X-9-.02 Subsection 5." |
| 5 | | Do you have any independent |
| 6 | | knowledge as to whether Ms. Viox was on the |
| 7 | | State register for the position of |
| 8 | | departmental program manager? |
| 9 | A | I don't have any recollection that that was |
| 10 | | ever checked. I believe I would have heard |
| 11 | | it if she were on that, but I don't recall |
| 12 | | that ever having been checked. |
| 13 | Q | And consistent with your testimony, this was |
| 14 | | not a provisional appointment; is that |
| 15 | | correct? |
| 16 | A | We made no official appointment of Ms. Viox. |
| 17 | Q | Okay. Let me just mark these as -- I think |
| 18 | | we already have your answers to |
| 19 | | interrogatories, and I think they are |
| 20 | | Plaintiff's Exhibit Four. And I will just |
| 21 | | direct you to the answer to interrogatory |
| 22 | | number seven. The interrogatory asked you |
| 23 | | to state whether Sharon Viox was appointed |

```
 1   A    She had to get approval from me to work on
 2        weekends for comp time purposes.  So, she
 3        would always send over a request if she
 4        needed to work on a weekend.
 5   Q    Okay.  All right.  Do you recall whether Ms.
 6        Viox received any comp time while she was
 7        assuming these responsibilities as
 8        secretary?
 9   A    I know that I approved comp time when she
10        worked on weekends or on holidays or in some
11        additional capacity to her 40-hour week.
12   Q    Now, such approval -- who would -- in order
13        to pay comp time, what's the procedure that
14        you go through?
15   A    We did not have enough money to pay comp
16        time in the Secretary of State's office, so
17        we gave hour for hour off for comp time.
18        So, in terms of the procedure, if the person
19        knew that he or she had to work additional
20        hours on some project or something that was
21        behind, they would write me just a note or
22        an e-mail saying, "I need to work these
23        additional hours.  Do you approve?"
```

62

1    Q    Was the State Personnel Director aware of

2         any overtime that Ms. Viox may have been

3         working?

4              MS. BYRNE:  I object to the form.

5    A    I don't believe Mr. Flowers at that time

6         kept up with individual agencies and what

7         process they used for overtime, comp time.

8         I am unaware if he personally checked on

9         that.

10   Q    Procedurally, would you be required to

11        submit that information to the State

12        Personnel Director?

13   A    I don't think so.  We just turned it in on

14        the payroll type forms that we had to turn

15        in to list comp time and that sort of

16        documentation.

17   Q    Let me ask you to look at the Rules again.

18        Let's look at page -- it's going to be page

19        37.

20              MS. BYRNE:  Rule number?

21              MR. WILSON:  Rule number 670-X-11.

22   Q    Let's look at page 38 of that rule.  Where

23        it says, "Compensatory Time.

1     Notwithstanding any departmental policy to

2     the contrary, it shall be the policy of the

3     State of Alabama to use compensatory time

4     rather than wages to compensate employees

5     subject to the provisions of the Fair Labor

6     Standards Act for performing overtime work.

7     Departmental overtime policies contrary to

8     the overall State policy must be approved by

9     the State Personnel Board.  Approval by the

10    State Personnel Board may be made in those

11    cases where compelling reasons are cited by

12    the appointing authority."

13        You do not recall any request by

14    you to approve compensatory time for Ms.

15    Viox during your tenure, do you?

16       MS. BYRNE:  I am going to object to the

17          form.

18  A   I do not recall sending any statement over

19    concerning Ms. Viox.

20  Q   Okay.  Now, when you left -- When did you

21    leave the Secretary of State's office?

22  A   In January of 2007.

23  Q   Okay.  And was Ms. Viox continuing to assume

Exhibit 8

<u>AFFIDAVIT</u>

Before me, the undersigned authority, a Notary Public in and for said County and State of Alabama at Large, personally appeared Carolyn S. Middleton, who being known to me and being by me first duly sworn and says as follows:

1. My name is Carolyn S. Middleton and I am over 21 years of age. I am the State Budget Officer for the State of Alabama and have personal knowledge of that which is contained herein.

2. In fiscal year 2003-2004, several state agencies experienced recommended budget cuts, including the Secretary of State's office and the Office of Voter Registration.

3. In February of 2003, Governor Bob Riley recommended an 18.85% reduction in the budgets of both the Office of Voter Registration and the Secretary of State's Office.

4. In June of 2003, Act No. 03-313 was implemented. This Act, among other things, transferred the Office of Voter Registration into the Office of the Secretary of State and the budgets were combined.

5. In the special session in September of 2003, the Governor recommended an 18% reduction in his proposed budget for the Secretary of State's Office which now had the Office of Voter Registration.

**Exhibit 5**

<span style="font-size:smaller">Jenkins USDC 05 cv 1049</span>

6. The budget, as passed, represented a 12% budget cut for the Secretary of State's Office. The additional money, however, could mainly be used for federal matching money under HAVA.

7. If the restricted HAVA money is removed from the calculation, the resulting budget cut for the Secretary of State's Office is 18%. (See Exhibit 1 - Excel worksheet)

**FURTHER, THE AFFIANT SAYETH NOT**

*Carolyn S. Middleton*
**CAROLYN S. MIDDLETON**

STATE OF ALABAMA      )
COUNTY OF MONTGOMERY )

I, the undersigned, a Notary Public in and for said County and State, hereby certify that CAROLYN S. MIDDLETON, whose name is signed to the foregoing Affidavit and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, she voluntarily executed the same on the day the same bears date.

Given under my hand and seal this the 11th day of November 2007.

_____
NOTARY PUBLIC

My Commission Expires: 10/06/08

## Secretary of State

| | | |
|---|---:|---:|
| FY 2003 General Fund Appropriation | 811,719 | |
| 3% Pay Raise | 16,618 | |
| Total FY 2003 Appropriation | 828,337 | |
| Governor's Original FY 2004 Appropriation - February | 672,225 | -18.85% |

**Secretary of State and Voter Registration Combined:**

| | | |
|---|---:|---:|
| Secretary of State total | 828,337 | |
| Voter Registration Total | 470,693 | |
| Supplemental Appropriation - HAVA Match - Act 03-299 | 640,350 | |
| Total Combined | 1,939,380 | |
| Governor's Original FY 2004 Appropriation - September | 1,590,292 | -18.00% |
| GF&A Sub - HAVA Funds | 116,000 | |
| As Passed - FY 2004 | 1,706,292 | -12.02% |

## Voter Registration

| | | |
|---|---:|---|
| FY 2003 General Fund Appropriation | 465,300 | |
| 3% Pay Raise | 5,393 | |
| | | |
| Total FY 2003 Appropriation | 470,693 | |
| | | |
| Governor's Original FY 2004 Appropriation - February | 381,984 | -18.85% |

**Secretary of State and Voter Registration Combined (W/O HAVA):**

| | | |
|---|---:|---|
| Secretary of State total | 828,337 | |
| Voter Registration Total | 470,693 | |
| | | |
| GF without HAVA funding - FY 2003 | 1,299,030 | |
| | | |
| GF without HAVA funding - FY 2004 | 1,065,205 | -18.00% |

Exhibit 9

## SECRETARY OF STATE

| | Actual 2000-2001 | Budgeted 2001-2002 | Requested 2002-2003 | Increase (Decrease) From Prior Year Amount | Percent | Governor's Recommendation 2002-2003 |
|---|---|---|---|---|---|---|
| Unencumbered Balance Brought Forward | 1,375,741 | 1,806,710 | 1,806,710 | | | 1,806,710 |
| **RECEIPTS:** | | | | | | |
| Federal and Local Funds: | | | | | | |
| Uniform Commercial Code | 538,408 | 216,718 | 500,000 | 283,282 | 130.71 | 500,000 |
| Corporations | 802,023 | 1,082,849 | 800,000 | (282,849) | (26.12) | 800,000 |
| Home Inspectors | 96,089 | 108,612 | 110,000 | 1,388 | 1.28 | 110,000 |
| Electronic Voting | | 5,249 | | (5,249) | (100.00) | |
| State Funds: | | | | | | |
| State General Fund | 828,753 | 828,285 | 869,700 | 41,415 | 5.00 | 837,864 |
| | 828,753 | 828,285 | 869,700 | 41,415 | 5.00 | 837,864 |
| TOTAL RECEIPTS | 2,265,273 | 2,241,713 | 2,279,700 | 37,987 | 1.69 | 2,247,864 |
| TOTAL AVAILABLE | 3,641,014 | 4,048,423 | 4,086,410 | 37,987 | 0.94 | 4,054,574 |
| LESS: EXPENDITURES | 1,834,304 | 2,241,713 | 4,086,410 | 1,844,697 | 82.29 | 4,054,574 |
| Balance Unencumbered | 1,806,710 | 1,806,710 | | (1,806,710) | (100.00) | |

SUMMARY BUDGET REQUEST

ADMINISTRATIVE SUPPORT SERVICES
PROGRAM:
Administration of Official Public Documents
Element:

| | Actual 2000-2001 | Budgeted 2001-2002 | Requested 2002-2003 | Increase (Decrease) From Prior Year Amount | Percent | Governor's Recommendation 2002-2003 |
|---|---|---|---|---|---|---|
| Personnel Costs | 1,101,890 | 1,188,991 | 1,410,021 | 221,030 | 18.59 | |
| Employee Benefits | 305,060 | 318,434 | 371,247 | 52,813 | 16.59 | |
| Travel - In-State | 3,000 | 7,000 | 7,000 | | | |
| Travel - Out-of-State | 15,000 | 28,000 | 23,000 | (5,000) | (17.86) | |
| Repairs and Maintenance | 5,333 | 44,000 | 44,000 | | | |
| Rentals and Leases | 97,894 | 116,000 | 116,000 | | | |
| Utilities and Communication | 116,827 | 160,000 | 303,823 | 143,823 | 89.89 | |
| Professional Services | 18,993 | 40,000 | 400,000 | 360,000 | 900.00 | |
| Supplies/Materials/Operating Expense | 157,909 | 252,288 | 872,294 | 620,006 | 245.75 | |
| Transportation Equipment Operations | 8,000 | 12,000 | 14,000 | 2,000 | 16.67 | |
| Grants & Benefits | 25 | | 25 | 25 | ..... | |
| Transportation Equipment Purchases | | 25,000 | 25,000 | | | |
| Other Equipment Purchases | 4,323 | 50,000 | 500,000 | 450,000 | 900.00 | |
| TOTAL EXPENDITURES | 1,834,304 | 2,241,713 | 4,086,410 | 1,844,697 | 82.29 | 4,054,574 |
| Total Number of Employees | 43.00 | 45.50 | 45.50 | | | |

| SOURCE OF FUNDS: | | | | | | |
|---|---|---|---|---|---|---|
| State General Fund | 828,753 | 828,285 | 869,700 | 41,415 | 5.00 | 837,864 |
| Uniform Commercial Code | 228,716 | 216,718 | 973,823 | 757,105 | 349.35 | 973,823 |
| Corporations | 747,454 | 1,082,849 | 1,858,568 | 775,719 | 71.64 | 1,858,568 |
| Home Inspectors | 29,381 | 108,612 | 379,070 | 270,458 | 249.01 | 379,070 |
| Electronic Voting | | 5,249 | 5,249 | | | 5,249 |
| TOTAL FUNDS | 1,834,304 | 2,241,713 | 4,086,410 | 1,844,697 | 82.29 | 4,054,574 |

AGENCY DESCRIPTION: Provides overall management for the office including contact with public, state, county, and city offices relating to all documents filed with this office. Serves as secretary of the Board of Adjustment and keeps records for this board. Certifies elections and performs various functions for boards of registrars. Receives and records all corporations that do business within the state. Receives and registers all land records and trademarks for the state. Handles all work related to the laws for uniform commercial codes. Provides for the registration and qualifications of home inspectors in the state.

# SECRETARY OF STATE

| | Actual 2001-2002 | Budgeted 2002-2003 | Requested 2003-2004 | Increase/(Decrease) From Prior Year | | Governor's Recommendation 2003-2004 |
|---|---|---|---|---|---|---|
| | | | | Amount | Percent | |
| Unencumbered Balance Brought Forward | 1,883,412 | 1,946,528 | 414,137 | (1,532,391) | (78.72) | 414,137 |
| **RECEIPTS:** | | | | | | |
| Federal and Local Funds: | | | | | | |
| Uniform Commercial Code | 869,232 | 500,000 | 850,000 | 350,000 | 70.00 | 1,023,503 |
| Corporations | 814,326 | 800,000 | 1,100,000 | 300,000 | 37.50 | 1,490,000 |
| Home Inspectors | 99,640 | | | | | |
| Electronic Voting | | 5,249 | | (5,249) | (100.00) | |
| State Funds: | | | | | | |
| State General Fund | 828,285 | 811,719 | 1,376,846 | 565,127 | 69.62 | 672,225 |
| State General Fund - Act 2002-295 | | 16,618 | | (16,618) | (100.00) | |
| State General Fund - Conditional Release | 32,152 | | | | | |
| TOTAL RECEIPTS | 2,643,635 | 2,133,586 | 3,326,846 | 1,193,260 | 55.93 | 3,095,728 |
| TOTAL AVAILABLE | 4,527,047 | 4,080,114 | 3,740,983 | (339,131) | (8.31) | 3,509,865 |
| LESS: EXPENDITURES | 2,215,662 | 3,665,977 | 3,740,983 | 75,006 | 2.05 | 3,509,865 |
| TRANSFER TO BUILDING COMMISSION - Act 2002-517 | 364,857 | | | | | |
| Balance Unencumbered | 1,946,528 | 414,137 | | (414,137) | (100.00) | |

## SUMMARY BUDGET REQUEST

**ADMINISTRATIVE SUPPORT SERVICES PROGRAM:**
Administration of Official Public Documents
Element:

| | Actual 2001-2002 | Budgeted 2002-2003 | Requested 2003-2004 | Amount | Percent | Governor's Recommendation 2003-2004 |
|---|---|---|---|---|---|---|
| Personnel Costs | 1,193,275 | 1,497,364 | 1,645,479 | 148,115 | 9.89 | |
| Employee Benefits | 340,685 | 486,744 | 482,124 | (4,620) | (0.95) | |
| Travel - In-State | 4,000 | 10,000 | 7,000 | (3,000) | (30.00) | |
| Travel - Out-of-State | 12,000 | 32,000 | 21,000 | (11,000) | (34.38) | |
| Repairs and Maintenance | 15,083 | 102,000 | 41,000 | (61,000) | (59.80) | |
| Rentals and Leases | 107,735 | 188,000 | 213,000 | 25,000 | 13.30 | |
| Utilities and Communication | 120,000 | 198,000 | 240,000 | 42,000 | 21.21 | |
| Professional Services | 268,616 | 246,000 | 197,152 | (48,848) | (19.86) | |
| Supplies/Materials/Operating Expense | 142,015 | 679,869 | 789,728 | 109,859 | 16.16 | |
| Transportation Equipment Operations | 14,783 | 31,000 | 19,500 | (11,500) | (37.10) | |
| Transportation Equipment Purchases | | 25,000 | | (25,000) | (100.00) | |
| Other Equipment Purchases | 37,470 | 170,000 | 85,000 | (85,000) | (50.00) | |
| TOTAL EXPENDITURES | 2,215,662 | 3,665,977 | 3,740,983 | 75,006 | 2.05 | 3,509,865 |
| Total Number of Employees | 38.75 | 47.25 | 49.75 | 2.50 | 5.29 | |
| **SOURCE OF FUNDS:** | | | | | | |
| State General Fund | 828,285 | 811,719 | 1,376,846 | 565,127 | 69.62 | 672,225 |
| State General Fund - Act 2002-295 | | 16,618 | | (16,618) | (100.00) | |
| State General Fund - Conditional Release | 32,152 | | | | | |
| Uniform Commercial Code | 536,135 | 973,823 | 1,207,058 | 233,235 | 23.95 | 973,823 |
| Corporations | 805,236 | 1,858,568 | 1,151,830 | (706,738) | (38.03) | 1,858,568 |
| Home Inspectors | 13,854 | | | | | |
| Electronic Voting | | 5,249 | 5,249 | | | 5,249 |
| TOTAL FUNDS | 2,215,662 | 3,665,977 | 3,740,983 | 75,006 | 2.05 | 3,509,865 |

**AGENCY DESCRIPTION:** Provides overall management for the office including contact with public, state, county, and city offices relating to all documents filed with this office. Serves as secretary of the Board of Adjustment and keeps records for this board. Certifies elections and performs various functions for boards of registrars. Receives and records all corporations that do business within the state. Receives and registers all land records and trademarks for the state. Handles all work related to the laws for uniform commercial codes.

## OFFICE OF THE SECRETARY OF STATE

| | Actual 2002-2003 | Budgeted 2003-2004 | Requested 2004-2005 | Increase/(Decrease) From Prior Year | | Governor's Recommendation 2004-2005 |
|---|---|---|---|---|---|---|
| | | | | Amount | Percent | |
| Unencumbered Balance Brought Forward | 2,019,549 | 7,307,697 | 7,878,634 | 570,937 | 7.81 | 7,878,634 |
| **RECEIPTS** | | | | | | |
| Federal and Local Funds | | | | | | |
| Uniform Commercial Code | 385,492 | 1,207,058 | 500,000 | (707,058) | (58.58) | 500,000 |
| Corporations | 792,180 | 1,151,830 | 800,000 | (351,830) | (30.55) | 800,000 |
| Electronic Voting | 819 | 5,249 | 6,249 | 1,000 | 19.05 | 6,249 |
| Voter Registration | 41,527 | 200,000 | 20,000 | (180,000) | (90.00) | 20,000 |
| Help America Vote - Federal | 5,040,681 | 13,448,087 | 9,850,000 | (3,598,087) | (26.76) | 9,850,000 |
| Interest Earned - Federal Help America Vote Act | 19,864 | | | | | |
| State Funds: | | | | | | |
| State General Fund | 811,719 | 1,065,205 | 1,972,884 | 907,679 | 85.21 | 1,100,663 |
| State General Fund - Act 2002-295 | 23,637 | | | | | |
| State General Fund - Transfer from Voter Registration | 264,798 | | | | | |
| State General Fund - Voter Registration | 200,502 | | | | | |
| State General Fund - Voter Registration - Act 2002-295 | 5,393 | | | | | |
| State General Fund - Help America Vote - State Match - Act 2003-299 | 640,350 | 641,087 | 493,000 | (148,087) | (23.10) | 493,000 |
| Departmental Emergency Fund Transfer | 225,000 | | | | | |
| **TOTAL RECEIPTS** | 8,451,962 | 17,718,516 | 13,642,133 | (4,076,383) | (23.01) | 12,769,912 |
| **TOTAL AVAILABLE** | 10,471,511 | 25,026,213 | 21,520,767 | (3,505,446) | (14.01) | 20,648,546 |
| LESS: EXPENDITURES | 3,065,532 | 17,147,579 | 19,968,012 | 2,820,433 | 16.45 | 19,588,791 |
| TRANSFER TO STATE GENERAL FUND | 98,282 | | | | | |
| Balance Unencumbered | 7,307,697 | 7,878,634 | 1,552,755 | (6,325,879) | (80.29) | 1,059,755 |

**SUMMARY BUDGET REQUEST**

**ADMINISTRATIVE SUPPORT SERVICES PROGRAM:**
Administration of Official Public Documents
Element:

| | Actual 2002-2003 | Budgeted 2003-2004 | Requested 2004-2005 | Amount | Percent | Governor's Recommendation 2004-2005 |
|---|---|---|---|---|---|---|
| Personnel Costs | 1,505,884 | 1,673,468 | 1,861,152 | 187,684 | 11.22 | |
| Employee Benefits | 463,031 | 529,009 | 615,790 | 86,781 | 16.40 | |
| Travel - In-State | 10,734 | 2,024,136 | 64,000 | (1,960,136) | (96.84) | |
| Travel - Out-of-State | 17,345 | 428,000 | 76,000 | (352,000) | (82.24) | |
| Repairs and Maintenance | 26,794 | 462,000 | 443,000 | (19,000) | (4.11) | |
| Rentals and Leases | 138,945 | 2,108,000 | 513,000 | (1,595,000) | (75.66) | |
| Utilities and Communication | 203,313 | 824,317 | 1,000,000 | 175,683 | 21.31 | |
| Professional Services | 417,211 | 2,218,143 | 2,446,249 | 228,106 | 10.28 | |
| Supplies/Materials/Operating Expense | 206,892 | 1,060,919 | 6,272,821 | 5,211,902 | 491.26 | |
| Transportation Equipment Operations | 35,456 | 31,500 | 431,000 | 399,500 | 1,268.25 | |
| Grants and Benefits | 75 | | | | | |
| Transportation Equipment Purchases | 30,275 | | | | | |
| Other Equipment Purchases | 9,577 | 5,788,087 | 6,245,000 | 456,913 | 7.89 | |
| **TOTAL EXPENDITURES** | 3,065,532 | 17,147,579 | 19,968,012 | 2,820,433 | 16.45 | 19,588,791 |
| Total Number of Employees | | | | | | |

**SOURCE OF FUNDS:**

| | Actual 2002-2003 | Budgeted 2003-2004 | Requested 2004-2005 | Amount | Percent | Governor's Recommendation 2004-2005 |
|---|---|---|---|---|---|---|
| State General Fund | 1,470,164 | 1,706,292 | 2,465,884 | 759,592 | 44.52 | 1,593,663 |
| State General Fund - Act 2002-295 | 29,030 | | | | | |
| Uniform Commercial Code | 557,017 | 1,207,058 | 536,351 | (670,707) | (55.57) | 536,351 |
| Corporations | 941,614 | 1,151,830 | 1,414,812 | 262,982 | 22.83 | 1,414,812 |
| Electronic Voting | | 5,249 | 6,249 | 1,000 | 19.05 | 6,249 |
| Voter Registration Fund | 41,528 | 200,000 | 20,000 | (180,000) | (90.00) | 20,000 |
| Help America Vote Federal Funds | 26,179 | 12,877,150 | 15,524,716 | 2,647,566 | 20.56 | 16,017,716 |
| **TOTAL FUNDS** | 3,065,532 | 17,147,579 | 19,968,012 | 2,820,433 | 16.45 | 19,588,791 |

## OFFICE OF THE SECRETARY OF STATE

| | Actual 2003-2004 | Budgeted 2004-2005 | Requested 2005-2006 | Increase/(Decrease) From Prior Year Amount | Percent | Governor's Recommendation 2005-2006 |
|---|---|---|---|---|---|---|
| Unencumbered Balance Brought Forward | 7,432,698 | 20,877,554 | 41,106,921 | 20,229,367 | 96.90 | 41,106,921 |
| | | | | | | |
| RECEIPTS | | | | | | |
| Federal and Local Funds: | | | | | | |
| Uniform Commercial Code | 425,407 | 425,000 | 425,000 | | | 425,000 |
| Corporations | 852,300 | 850,000 | 876,434 | 26,434 | 3.11 | 876,434 |
| Electronic Voting | | | 6,249 | 6,249 | ..... | 6,249 |
| Voter Registration | 83,876 | 20,000 | 20,000 | | | 20,000 |
| Help America Vote - Federal | 12,835,342 | 35,833,513 | | (35,833,513) | (100.00) | |
| Interest Earned - Federal Help America Vote Act | 59,543 | 287,810 | 411,012 | 123,202 | 42.81 | 411,012 |
| Federal Voting Asst. for Individuals With Disabilities | | 315,172 | | (315,172) | (100.00) | |
| State Funds: | | | | | | |
| State General Fund | 1,047,720 | 1,100,663 | 1,593,683 | 493,020 | 44.79 | 1,593,683 |
| State General Fund - Transfer Help America Vote | 658,572 | 493,000 | | (493,000) | (100.00) | |
| State General Fund - Court Ordered Attorney Fees | 9,000 | | | | | |
| | | | | | | |
| TOTAL RECEIPTS | 15,971,760 | 39,325,158 | 3,332,378 | (35,992,780) | (91.53) | 3,332,378 |
| | | | | | | |
| TOTAL AVAILABLE | 23,404,458 | 60,202,712 | 44,439,299 | (15,763,413) | (26.18) | 44,439,299 |
| | | | | | | |
| LESS: EXPENDITURES | 2,501,303 | 19,095,791 | 44,439,299 | 25,343,508 | 132.72 | 44,439,299 |
| REVERSIONS TO STATE GENERAL FUND | 25,601 | | | | | |
| | | | | | | |
| Balance Unencumbered | 20,877,554 | 41,106,921 | | (41,106,921) | (100.00) | |

### SUMMARY BUDGET REQUEST

ADMINISTRATIVE SUPPORT SERVICES PROGRAM:
Administration of Official Public Documents

| Element: | | | | | | |
|---|---|---|---|---|---|---|
| Personnel Costs | 1,259,641 | 1,487,690 | 1,561,013 | 73,323 | 4.93 | |
| Employee Benefits | 379,811 | 595,897 | 625,684 | 29,787 | 5.00 | |
| Travel - In-State | 8,618 | 52,000 | 52,500 | 500 | 0.96 | |
| Travel - Out-of-State | 12,279 | 104,000 | 104,000 | | | |
| Repairs and Maintenance | 41,853 | 62,000 | 87,000 | 25,000 | 40.32 | |
| Rentals and Leases | 64,887 | 268,000 | 323,000 | 55,000 | 20.52 | |
| Utilities and Communication | 340,583 | 4,280,000 | 4,756,803 | 476,803 | 11.14 | |
| Professional Services | 90,670 | 268,000 | 298,000 | 30,000 | 11.19 | |
| Supplies/Materials/Operating Expense | 289,692 | 2,837,488 | 2,934,906 | 97,418 | 3.43 | |
| Transportation Equipment Operations | 9,124 | 56,000 | 61,000 | 5,000 | 8.93 | |
| Other Equipment Purchases | 4,145 | 9,084,716 | 33,635,393 | 24,550,677 | 270.24 | |
| | | | | | | |
| TOTAL EXPENDITURES | 2,501,303 | 19,095,791 | 44,439,299 | 25,343,508 | 132.72 | 44,439,299 |
| | | | | | | |
| Total Number of Employees | 49.25 | 48.75 | 47.75 | (1.00) | (2.05) | |

| SOURCE OF FUNDS: | | | | | | |
|---|---|---|---|---|---|---|
| State General Fund | 1,031,119 | 1,100,663 | 1,593,683 | 493,020 | 44.79 | 1,593,683 |
| Uniform Commercial Code | 630,873 | 536,351 | 842,693 | 306,342 | 57.12 | 842,693 |
| Corporations | 697,580 | 1,414,812 | 1,458,176 | 43,364 | 3.07 | 1,458,176 |
| Electronic Voting | | | 6,249 | 6,249 | | 6,249 |
| Voter Registration Fund | 90,920 | 20,000 | 20,105 | 105 | 0.53 | 20,105 |
| Help America Vote Federal Funds | 50,811 | 16,017,716 | 40,518,393 | 24,500,677 | 152.96 | 40,518,393 |
| | | | | | | |
| TOTAL FUNDS | 2,501,303 | 19,095,791 | 44,439,299 | 25,343,508 | 132.72 | 44,439,299 |

AGENCY DESCRIPTION: Provides overall management for the office including contact with public, state, county, and city offices relating to all documents filed with this office. Serves as secretary of the Board of Adjustment and keeps records for this board. Certifies elections and performs various functions for boards of registrars. Receives and records all corporations that do business within the state. Receives and registers all land records and trademarks for the state. Handles all work related to the laws for uniform commercial codes.

Exhibit 10

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                  NORTHERN DIVISION

4

5    **ROBINA JENKINS,**

6          Plaintiff,
                              CIVIL ACTION
7          VS.
                              FILE NO. 2:05-CV-1049-C
8
     **NANCY WORLEY,** individually and
9    in her official capacity as
     Secretary of State, State of
10   Alabama; **JOE DICKSON,** individually
     and in his official capacity as
11   a member of the State Personnel
     Board, et al.
12
          Defendants.
13

14                              **COPY**

15          *       *       *       *       *

16          DEPOSITION OF **JOE NATHAN DICKSON,** taken on

17   behalf of the Plaintiff, pursuant to the

18   stipulations set forth herein, before Jeana S.

19   Boggs, Certified Court Reporter and Notary Public,

20   at the offices of James E. Wilson, Jr. 732 Carter

21   Hill Road, Montgomery, Alabama, commencing at

22   approximately 9:03 a.m., Wednesday, January 16,

23   2008.

1             APPEARANCES OF COUNSEL

2 FOR THE PLAINTIFF:

3         HONORABLE JAMES E. WILSON, JR.

4         Attorney At Law

5         732 Carter Hill Road

6         Montgomery, Alabama  36106

7         334.834.9899

8 FOR THE DEFENDANTS:

9         HONORABLE ALICE ANN BYRNE

10        Attorney At Law

11        STATE OF ALABAMA PERSONNEL DEPARTMENT

12        Legal Division

13        64 North Union Street, Suite 316

14        Montgomery, Alabama  36104

15        334.353.4481

16 ALSO PRESENT:

17        MS. JACKIE GRAHAM, STATE PERSONNEL DIR

18              * * *

19

20

21

22

23

```
 1        employed?

 2   A    I am self-employed.  I am a real estate

 3        broker.

 4   Q    Currently?  How long have you been doing

 5        that?

 6   A    I've had a real estate licensed broker

 7        for -- since nineteen -- about 1978.

 8   Q    Okay.  Now, are you currently serving in

 9        some capacity with the State of Alabama?

10   A    Yes.

11   Q    And what is that capacity?

12   A    I serve as chairman of the Alabama State

13        Personnel Board.

14   Q    Now, how long have you been a member of the

15        Personnel Board?

16   A    I was appointed in 1992, February of 1992.

17   Q    Okay.  And you say that you are a chairman.

18        How did you become chairman?  What's the

19        process that you go through?

20   A    A vote of the members of the Board.

21   Q    Okay.  Now, you are generally familiar with

22        the rules and regulations of the State

23        Personnel Board, are you not?
```

```
 1   A    Yes, sir.
 2   Q    Okay.  What -- What is the relationship
 3        between the State Board and the State
 4        Personnel Director?
 5   A    We act as a supervisor as such, myself --
 6        mainly.
 7   Q    Is she appointed by the Board?
 8   A    Yes, sir.
 9   Q    Okay.  Do you recall when she was appointed?
10   A    She was appointed at the retirement of the
11        past personnel director who retired
12        approximately two years ago, I think --
13        three years ago.  I can't remember.
14   Q    Now, what are your duties and
15        responsibilities as chairman of the State
16        Personnel Board?
17   A    I chair the meetings, conduct the -- and
18        then when we they conduct their business, we
19        just chair the meetings.
20   Q    Okay.  Do you receive compensation for your
21        duties and responsibilities?
22   A    Yes, sir.
23   Q    Okay.  What is that compensation?
```

8

| | | |
|---|---|---|
| 1 | A | $50 a meeting, travel to and from |
| 2 | | Birmingham. |
| 3 | Q | It's been $50 a long time, hasn't it? |
| 4 | A | Yes, sir. |
| 5 | Q | About time for a raise, isn't it? |
| 6 | A | The Legislature makes that decision. |
| 7 | | MS. BYRNE:  Feel free to help if you |
| 8 | | like. |
| 9 | A | Are you going to draw up that bill? |
| 10 | Q | You are also generally familiar with the |
| 11 | | Merit System Act, are you not? |
| 12 | A | Yes, sir. |
| 13 | Q | Okay.  Now, back in 2003, the Governor and |
| 14 | | the Legislature I think passed some sort of |
| 15 | | bill with something asking for an |
| 16 | | across-the-state reduction in every |
| 17 | | department or agency; do you recall that? |
| 18 | A | I recall the Governor seeking a reduction |
| 19 | | for about 18 percent. |
| 20 | Q | Okay.  And that involved, did it not, the |
| 21 | | laying off of employees in various State |
| 22 | | agencies and departments? |
| 23 | A | Yes, sir. |

1  going to mark as Plaintiff's Exhibit Two and

2  ask you can you identify this document for

3  us.

4       (At which time, the referred-

5       to document was marked as

6       Plaintiff's Exhibit No. 2.)

7 A -- 36-26?

8 Q Yeah, 36-26-6.  And let me represent to you

9  that appears to be State statute taken out

10  of the State Code, Code of Alabama, 1975,

11  governing meetings, powers, and duties

12  generally of the State Board -- Personnel

13  Board.

14    Now, let me direct your attention

15  to paragraph three of that statute, which

16  indicates that one of the duties of the

17  State Personnel Board is, "To make

18  investigations, either on petition of a

19  citizen, taxpayer or interested party or of

20  its own motion, concerning the enforcement

21  and effect of this article and to require

22  observance of its provisions and the rules

23  and regulations made pursuant thereto."

```
 1              Now, how do you interpret that,

 2      Mr. Dickson?

 3   A  I interpret it to mean that -- to make an

 4      investigation if required to.  If a

 5      petition -- somebody petitions on petition

 6      of a citizen, we would require to a petition

 7      of a citizen, taxpayer or interested party.

 8      I would think that the Board has the power

 9      to investigate.

10   Q  Okay.  I am going to show you what I am

11      going to mark as Plaintiff's Exhibit Three.

12                  (At which time, the referred-

13                   to document was marked as

14                   Plaintiff's Exhibit No. 3.)

15   Q  And let me ask you a couple of questions

16      about --

17          MS. BYRNE:  Just can I ask where this

18              came from?

19          MR. WILSON:  It came from the State Law

20              Library.

21          MS. BYRNE:  Okay.  Well, you are aware

22              it's several years out of date,

23              just for the record.  It's dated
```

```
1        Governor."

2                Okay.  How do you interpret that?

3            MS. BYRNE:  Object to the form.

4    Q    What's your interpretation?

5    A    That if you are -- if you have an appeal, if

6         you feel that you -- something is wrong,

7         what you do is you file a petition with the

8         Director, and the Director gets it to the

9         Board.  And once he gets -- He gives copies

10        to the members and to the Governor.

11   Q    Okay.  Now, let's go back to what we have

12        identified as Plaintiff's Exhibit Five, I

13        think it is, which is entitled "Petition for

14        Review."  Have you ever seen this document

15        before?

16   A    Uh-uh (negative response).

17   Q    Do you know whether this document was ever

18        presented to the Board, the State Personnel

19        Board?

20   A    Uh-uh (negative response).

21   Q    Okay.  On page three in the section for

22        relief, it requests a petition that the

23        Board set this matter for a hearing.
```

1    have you ever seen this petition?

2   A    No, I have not seen it.

3   Q    Okay.  Is this a petition that should have

4        been referred to the State Personnel Board?

5        MS. BYRNE:  Object to the form.

6   A    I can't say.  I can't say because I didn't

7        see it, and I don't know the time line on

8        it.  But it's -- I can't say.  I haven't

9        seen this.

10  Q    Do you know whether any member of the State

11       Personnel Board has ever seen that petition?

12  A    I can't say either.

13  Q    Okay.  Now, the petitioner, which is the

14       plaintiff in this case in that petition,

15       asserts that the appointing authority, Nancy

16       Worley, had appointed a person to her

17       position within the two years without first

18       offering the position to her.  Would -- If

19       you assume those allegations are true, would

20       that have been a violation of the Merit

21       System Act?

22  A    If she had appointed somebody in a position,

23       that position was --

1    Q    Departmental program manager.

2    A    If she had --

3    Q    If she had.

4    A    -- it would have been in violation.

5    Q    Okay.  And that would have been a matter

6         that you -- and I say "you," the State

7         Personnel Board, under the Rules could have

8         enforced or corrected it; is that correct?

9    A    That's correct.

10   Q    All right.  Do you recall having any

11        conversation with the State Personnel

12        Director regarding this petition?

13   A    No.

14   Q    Okay.  Do you know whether any member --

15        other member of the Board had a conversation

16        with the State Personnel Director regarding

17        this petition?

18   A    I don't -- I can't say.

19   Q    Now, let me show you what I am going to mark

20        as Plaintiff's Exhibit Six, I think we are

21        down to.

22                  (At which time, the referred-

23                   to document was marked as

```
 1   Q    Okay.  Page two of that document represents

 2        to be a business card with the name Sharon

 3        Viox on it, and indicating that she is the

 4        acting director of the corporate division.

 5        Have you ever seen that card before?

 6   A    No.

 7   Q    And I represent to you that Acting Director

 8        of the Corporate Division and the

 9        Departmental Program Manager are the same

10        position.

11             MS. BYRNE:  Object to the form.

12                  Misrepresentation of the facts and

13                  assumes facts not in evidence.

14             MR. WILSON:  Okay.

15             MS. BYRNE:  Go ahead and answer if you

16                  -- if there's a question.

17             MR. WILSON:  I think it was a

18                  statement.  So, I probably should

19                  have been asking a question.  But

20                  let's go on.

21   BY MR. WILSON:

22   Q    Now, if you had been aware that the

23        Secretary of State had made this appointment
```

1        on Ms. Viox's position almost immediately

2        after the layoff, would the plaintiff have

3        been entitled to a hearing challenging that

4        appointment?

5            MS. BYRNE:  Object to the form.  Answer

6                if you can.

7    A    If she had petitioned the personnel director

8        and come before the ALJ, it depends if

9        whether or not the ALJ would have gotten

10       to us -- whether it would have gotten to the

11       Board or not.

12   Q    Okay.  Now, can we agree or would you agree

13       with me that she was entitled to some sort

14       of hearing before somebody?

15           MS. BYRNE:  I object to the form.

16   A    If she petitioned, filed a grievance -- not

17       a grievance, but filed a complaint or

18       whatever, to get to -- if she did that.

19   Q    Do you consider the petition, which is

20       Plaintiff's Exhibit Five, as a pleading of

21       documents which would have afforded her a

22       hearing before somebody, the ALJ, the State

23       Personnel Board, somebody?

```
 1        the Merit System Law have regarding acting

 2        personnel?

 3   A    There is no rule.  The appointing authority

 4        runs his shop, his or her shop, and they

 5        stay within classifications.  But if they

 6        decide that somebody is acting, there's

 7        nothing we can do about it.

 8   Q    Okay.  All right.  Now, let's look at page

 9        31 here.  At the bottom of page it has

10        certifications and appointments.  This is

11        Rule 670-X9-.03.

12             MS. BYRNE:  9.03?

13             MR. WILSON:  Yeah.  670-X.

14             MS. BYRNE:  Yeah.  Just so you will

15                  know, the designation of all these

16                  rules has changed, and I attached

17                  the layoff to the motion for

18                  summary judgment the current

19                  rules.  So, it's going to be very

20                  confusing, but I just wanted to

21                  point that out.

22   BY MR. WILSON:

23   Q    Okay.  Now, paragraph one indicates types of
```

```
 1    Q    Uh-huh (positive response).

 2    A    Acting interim director.

 3    Q    Uh-huh (positive response).

 4    A    That's what I think -- that's what I say it

 5         is.

 6    Q    This is not a position in classified service

 7         of State government, is it?

 8    A    No, sir.

 9    Q    Has -- Before this lawsuit, had anyone ever

10         communicated with you about this appointment

11         made by Ms. Worley in the State Personnel

12         office?

13              MS. BYRNE:  Object to the form.

14                   Mischaracterization.

15    A    No.

16    Q    Do you recall any conversations with the

17         State Personnel Director about this

18         appointment?

19              MS. BYRNE:  Object to the form.

20                   Misstatement of testimony.

21    Q    Now, let me represent to you that at the

22         time Ms. Worley made this appointment of

23         Sharon Viox to the position, she held the
```

```
 1        employees in the Secretary of State's

 2        office, their positions, so forth and so on.

 3        Under the corporate division, it has Sharon

 4        Viox as division director.

 5    A   Uh-huh (positive response).

 6    Q   Okay.  Let me represent to you that she is

 7        in State service classified as an ASA-3.

 8        Would she not be working out of her

 9        classification?

10            MS. BYRNE:  Object to the form.  Go

11                 ahead and answer if you can.

12    A   I would think she is working out of her

13        classification because she is working as the

14        acting division director.

15    Q   Now, let me represent to you she has been

16        doing that since Nancy Worley laid the

17        Plaintiff off in this case.  Okay?

18    A   Uh-huh (positive response).

19    Q   Now, she has been working out of her

20        classification for several years.

21    A   Uh-huh (positive response).

22    Q   Now, based on that Attorney General's

23        opinion, wouldn't that also be a violation
```

```
 1        manager.

 2               MS. BYRNE:  I am going to object to

 3                      that representation.

 4   A    I can't testify -- I can't say yea or nay on

 5        that.  I just know that what the secretary -

 6        she is not Secretary of State now, I think.

 7        Is she Secretary of State now?

 8   Q    No.

 9   A    She represented, according to this material

10        I've been reading, that she appointed her as

11        acting -- as an acting individual, not as a

12        classification.  She didn't come before our

13        Board and requested that classification.

14   Q    And that's my point.  Do you have any

15        requests from Nancy Worley, Secretary of

16        State, requesting that classification?

17   A    No, but that's -- that's -- we have -- I've

18        seen four or five Attorney General's opinion

19        saying the appointing authority can appoint

20        an acting authority.  One of the things that

21        really came to mind was the progression of

22        the department.  They appointed an acting

23        individual to act as one to execute
```

```
 1        even if they pull somebody off the

 2        reemployment register -- if they hired

 3        somebody and appointed them or if they went

 4        to a register in any department in her

 5        classification and hired anybody, then she

 6        would have a case.

 7   Q    Okay.  She filed a petition with you saying

 8        that the lady appointed somebody to the

 9        position.

10   A    But she didn't.

11   Q    Yes, she did.  There it is.  The petition is

12        right before you.

13   A    The petition is here, but the lady that she

14        was referring to is an acting individual,

15        and we have got four Attorney General's

16        opinions saying that you can do it.

17   Q    You never investigated it.  The Board, the

18        State Personnel Board, never investigated

19        the petition.

20   A    We didn't investigate the petition because

21        we never saw the petition.

22   Q    Well, now, is that Ms. Jenkins' fault that

23        you didn't see it?  Whose fault is that?
```

Exhibit 11

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE MIDDLE DISTRICT OF ALABAMA

3                     NORTHERN DIVISION

4

5      **ROBINA JENKINS,**

6              Plaintiff,
                                CIVIL ACTION
7           VS.
                                FILE NO. 2:05-CV-1049-C
8
       **NANCY WORLEY,** individually and
9      in her official capacity as
       Secretary of State, State of
10     Alabama; **JOE DICKSON,** individually
       and in his official capacity as
11     a member of the State Personnel
       Board, et al.
12
               Defendants.
13

14                                    **COPY**

15          *       *       *       *       *

16          DEPOSITION OF **SHARON LUVERNE VIOX,** taken

17     on behalf of the Plaintiff, pursuant to the

18     stipulations set forth herein, before Jeana S.

19     Boggs, Certified Court Reporter and Notary Public,

20     at the offices of James E. Wilson, Jr. 732 Carter

21     Hill Road, Montgomery, Alabama, commencing at

22     approximately 9:03 a.m., Friday, December 21st,

23     2007.

```
1              APPEARANCES OF COUNSEL

2    FOR THE PLAINTIFF:

3              HONORABLE JAMES E. WILSON, JR.

4              Attorney At Law

5              732 Carter Hill Road

6              Montgomery, Alabama   36106

7              334.834.9899

8    FOR THE DEFENDANTS:

9              HONORABLE ALICE ANN BYRNE

10             Attorney At Law

11             STATE OF ALABAMA PERSONNEL DEPARTMENT

12             Legal Division

13             64 North Union Street, Suite 316

14             Montgomery, Alabama   36104

15             334.353.4481

16                       *  *  *
17   Plaintiff's Exhibit No. 1......................15

18   Plaintiff's Exhibit No. 2......................18

19   Plaintiff's Exhibit No. 3......................26

20   Plaintiff's Exhibit No. 4......................28

21   Plaintiff's Exhibit No. 5......................42

22   Plaintiff's Exhibit No. 6......................58

23   Plaintiff's Exhibit No. 7......................64
```

```
 1   A    ASA-1.

 2   Q    All right.  Do you recall what your duties

 3        and responsibilities were?

 4   A    When I first started, I was working with the

 5        foreign corporations.  I was doing data

 6        entry, answering telephones.

 7   Q    Okay.  I was looking at your -- the

 8        documents in your file at some point.  You

 9        resigned from the Secretary of State's

10        office briefly.

11   A    I did for a short time.

12   Q    Okay.  And then you were reemployed?

13   A    Yes, sir.

14   Q    Were you reemployed as an ASA-1 when you

15        were employed?

16   A    I don't remember.

17   Q    Okay.

18   A    And that's the truth.  I really don't.

19   Q    Okay.

20   A    I don't know if I was an ASA-3 at that point

21        or if I was still an ASA-1.

22   Q    Okay!  At some point, you were promoted, I

23        guess?
```

```
1    A    Right, to ASA-3.

2    Q    ASA-3?

3    A    Yes, sir.

4                    (At which time, there was a

5                    brief interruption.)

6    Q    I think I was asking you about the duties

7         and responsibilities for the ASA-3 position.

8    A    Okay.

9    Q    Well, let me back up.  The approximate date

10        as I reviewed it is about 2002.  It looks

11        like it was about June, 1990 -- I'm sorry.

12        No.  That's wrong.

13   A    I don't remember to be honest about it.

14   Q    About September 2000 is when you received

15        the appointment --

16   A    Okay.

17   Q    -- or promotion to the --

18   A    ASA-3.

19   Q    ASA-3.

20   A    Okay.  I'll take your word because I don't

21        remember.

22   Q    Yeah, okay.

23   A    I just worked through there, and it was,
```

1       like, okay, and I wasn't...

2   Q   Now, what's your current classification?

3   A   ASA-3.

4   Q   Okay.  What position do you currently hold

5       with the Secretary of State?

6   A   I am an ASA-3, but they have given me the

7       title as director.

8   Q   Okay.  I was looking at the website, current

9       website, of the --

10  A   Secretary of State.

11  Q   -- Secretary of State's office.  And it

12      lists, I guess, all the employees in the

13      State --

14  A   Yes, sir.

15  Q   -- as well as --

16  A   Well, just the Secretary of State's office,

17      really.

18  Q   Yeah, that's right.

19  A   Yes, sir.

20  Q   Just the Secretary of State's office.  And

21      down in the corporation business section, it

22      lists you as the division director.

23  A   Division director, yes, sir.

23

```
 1        over that section because somebody had to

 2        keep it going.  And she had called me over

 3        and said that Ms. Jenkins had been let go.

 4        And that -- not let go, but, you know, had

 5        been laid off, and that she was going to

 6        appoint me as supervisor and acting

 7        director, and that was about it.

 8    Q   Okay.  Do you recall the approximate date

 9        when this discussion took place?

10    A   No, sir, I don't.

11    Q   Would it have been maybe a month or so

12        after --

13    A   It was about that, yes, sir.

14    Q   -- Ms. Jenkins was laid off?

15    A   Because I was waiting to see what was going

16        to happen, and I -- just like I said, I was

17        just trying to hold it together until

18        somebody, you know, just did something to

19        put somebody in charge over there.

20    Q   Okay.  At some point after that discussion

21        you were, in fact, appointed the acting

22        director or at least assumed that position?

23    A   Yes, sir.
```

```
1   Q    Okay.  What additional duties did you assume

2        upon becoming acting director of the

3        corporate division.

4   A    Just taking the leave slips and making sure

5        they got turned in.  Then I had to start

6        writing new evaluations for the personnel.

7   Q    Okay.  Now, let me -- let's back up one

8        minute and show you the -- on composite

9        Exhibit Two the evaluation for the ASA-3

10       position.  And I am going to ask you to look

11       at page two of that evaluation.

12            MS. BYRNE:  What date is that?  I'm

13                 sorry.

14            MR. WILSON:  This is for the period

15                 1/1/2002 to 1/1/2003.

16  Q    On the second page is a list of the

17       responsibilities and duties as an ASA-3.

18  A    At that time.

19  Q    At that time.

20  A    Yes, sir.

21  Q    Does this list accurately reflect what you

22       were doing as an ASA-3 at that time?

23  A    Yes, sir.
```

1    Q    Okay.  Now, did you receive any documents or

2         correspondence from Ms. Worley indicating

3         that you were going to be appointed to the

4         acting position as a division director?

5    A    Nothing.  The only thing I received was --

6         at one point was some business cards with my

7         name and that title on it, but there is

8         nothing in writing that I know of that says

9         that I've got -- she's, you know, appointing

10        me to that position.  Not that I am aware of

11        except the business cards that showed up.

12   Q    Okay.  You never received any document from

13        the State Personnel Board indicating that

14        Ms. Worley had appointed you to this acting

15        director's position?

16   A    Not that I remember seeing, no, sir.

17   Q    Okay.  Do you know whether the Board was

18        aware that you had been appointed?

19   A    I have no idea.

20   Q    Now, let me show you what I am going to mark

21        as composite Exhibit Three, and let me see

22        if I can find you this so you can compare

23        the two.  What we have marked as Plaintiff's

```
 1              MR. WILSON:  This is '06.  Is that the

 2              same here?  Is that second down

 3              there.  Off the record.

 4                   (At which time, there was an

 5                   off-the-record discussion.)

 6  Q    Now, I think we had the complete document

 7       there.  I guess I was asking you to look at

 8       page -- which would be three instead of two.

 9  A    Okay.

10  Q    Okay.  Right.  Now, that lists the

11       responsibilities -- duties and

12       responsibilities -- that you had as of the

13       date of this evaluation which is 1/2/04.

14       Okay?  Now, who developed this list of your

15       responsibilities; do you know?

16  A    I was asked what I do when I am doing over

17       there.

18  Q    Right.

19  A    And I gave them a general idea of what I

20       did, and then they developed the rest of it.

21  Q    Okay.  So, that accurately reflects --

22  A    What I was doing at the time.

23  Q    -- what you were doing at the time?
```

```
1   A    Uh-huh (positive response).

2   Q    Okay.  Now, is it a fair statement to say

3        that your responsibilities increased -- the

4        duties and responsibilities increased after

5        you were appointed the acting director?

6   A    Yes, sir.

7   Q    Okay.  And let's just compare, if we will,

8        the duties and responsibilities that you had

9        when you were an ASA -- let's get it correct

10       from the evaluation.

11  A    When I was working for Robina.

12  Q    Right.  Yeah.  The evaluation period here is

13       12/4/02; is that correct?

14  A    1/2 of '02 --

15  Q    1/2/03.

16  A    -- to 1 of '03.

17  Q    Yeah.  It was actually signed 12/4.

18  A    Uh-huh (positive response).

19  Q    And the second page that we are looking at

20       is the duties and responsibilities that you

21       had at that time --

22  A    Uh-huh (positive response), yes.

23  Q    -- versus the duties and responsibilities
```

```
 1        did some of the evaluations of those nine

 2        personnel?

 3   A    Anybody that was working in corporations

 4        during that time frame after Ms. Jenkins

 5        left, I did the evaluations on.

 6   Q    Okay.  Now, did Ms. Worley at any time

 7        indicate to you that your appointment as

 8        acting director was a promotion?

 9   A    No.

10   Q    Okay.  Did she at any time indicate that

11        this was a temporary appointment?

12   A    Yes.

13   Q    Okay.  Did she give you a time limitation

14        that she thought you would --

15   A    No.

16   Q    Okay.  Did she at any time indicate to you

17        that this was an emergency appointment?

18   A    I don't think so.

19   Q    Okay.  How about an exceptional appointment?

20   A    I don't think so.  It was just --

21   Q    You don't know what I am talking about when

22        I say these things, do you?

23   A    No, sir.
```

1    Q    Okay.  And let me ask you just for the

2         record about a couple of other things.  Did

3         she ever indicate that it was a provisional

4         appointment?

5    A    No, sir.  She just said I need you to do

6         this, and I did it.

7    Q    Okay.

8    A    Because I was just trying to hold it

9         together.

10    Q    Okay.  And did she ever indicate that it was

11         a conditional appointment?

12    A    I don't remember her using those words.

13    Q    Okay.  Did you ever apply through the State

14         Personnel Department for the classification

15         of division director of the corporate

16         division?

17    A    No, sir.

18    Q    Okay.  Do you know whether you have ever

19         been included on the State personnel

20         register as a person eligible to be

21         appointed to the division director's

22         position in the Secretary of State's office?

23    A    No, sir.

```
 1   Q    Do you know whether you have ever been
 2        listed by the State Personnel Department as
 3        a person eligible for appointment to the
 4        position of division director in the
 5        Secretary of State's office?
 6   A    No, sir.
 7   Q    Have you ever been included on a State
 8        personnel register as a person in a class
 9        who could compete for a promotion to the
10        position of division director in the
11        Secretary of State's office?
12   A    No, sir.
13   Q    Now, since your appointment as acting
14        director of the corporate division,
15        Secretary of State's office, have you
16        received a salary adjustment as a result of
17        being appointed acting director?
18   A    No, sir.  The only money I have ever
19        received is just my step raises.
20   Q    Okay.
21             MS. BYRNE:  Is what?
22             THE WITNESS:  My raises.
23   Q    Merit raises.
```

1    A    There we go.

2    Q    Now, you are currently being compensated by

3         the State of Alabama for the position or

4         classification as an ASA-3; is that correct?

5    A    Correct.

6    Q    Did Ms. Worley at any time prior to leaving

7         office -- I may have asked this, but I'm

8         going to get confused -- indicate to you

9         that your position was going to become

10        permanent?

11    A    No.

12    Q    Okay.  Have you ever taken an examination

13        offered by the State Personnel Board for the

14        classification of division director of the

15        Secretary of State's office?

16    A    No, sir.

17    Q    Have you ever held a position or held a

18        classification in State service as a State

19        professional trainee to the position of

20        department program manager?

21    A    No, sir.

22    Q    Okay.  Have you ever heard of such position?

23    A    No, sir.

```
 1   A   Yes, sir.

 2   Q   And I assume that Jean Jordan was the person

 3       that you were supervising; is that correct?

 4   A   Yes, sir.

 5   Q   Was she under your supervision when you were

 6       first appointed acting director of the

 7       Secretary of State by Ms. Worley?

 8   A   Yes, sir.

 9   Q   Okay.  All right.  Let me ask you about the

10       second evaluation in this composite exhibit.

11       Is not this the evaluation of Elaine --

12   A   Swearengin.

13   Q   -- Swearengin?

14   A   Uh-huh (positive response).

15   Q   And the date of the evaluation is 04 -- I'm

16       sorry.  04 --

17   A   01/06 to --

18   Q   Yeah.

19   A   -- 04/01/07.

20   Q   Okay.  Is this evaluation signed by you?

21   A   It is.

22   Q   And the date of the evaluation is --

23   A   2/23 of '07.
```

1      Ms. Worley, and it was -- it was just a lot

2      of tension.

3  Q   Okay.  Now, as a result of these transfers

4      or resignations and bringing in new persons,

5      were there occasions that you had to work

6      after hours and try to keep things together?

7  A   Yes, sir.

8  Q   During the course of a week when, you know,

9      the transition was taking place,

10     approximately how many hours do you think

11     that you had to work beyond your regular

12     working hours?

13  A   Probably a couple of hours a day.

14  Q   Okay.

15  A   But that was volunteer -- voluntary.

16  Q   Okay.  Your regular working hours was -- was

17     it 40 hours a week, I think?

18  A   Eight to five, yes, sir.

19  Q   Eight to five.  And were there occasions

20     also that you had to work on the weekends?

21  A   Yes, sir, a couple.

22  Q   Do you recall maybe how many weekends during

23     --

1  A    No, sir, I don't remember.  I don't keep

2       track.  I just did what had to be done to

3       make the work happen.

4  Q    Okay.  If you worked extra hours, would

5       it -- would you necessarily have to be using

6       a computer?  What kinds of stuff would you

7       be doing?

8  A    Yeah, I would be doing -- A couple of times,

9       I had to work extra on the weekend because I

10      had to post checks, and I would be using a

11      computer to post checks, yes, sir.  And if I

12      was doing data entry, I would be using the

13      computer to do the data entry for whatever I

14      was working on.

15 Q    Okay.

16 A    Most of my job that I do is -- relates to a

17      computer.

18 Q    I got you.  So, and when you get through

19      with your computer, you sign off?

20 A    Yes, sir.

21 Q    So, there would probably be a log somewhere

22      of the time period that you signed off on

23      the computer?

```
 1   A   Yes, there should be, sir, somewhere.

 2   Q   And also the time period that you worked on

 3       weekends; is that --

 4   A   Yes, sir, it should be.  Because if I was

 5       logged on the computer, it would be there.

 6   Q   Uh-huh (positive response).  Now, you say

 7       this was voluntary?

 8   A   Yes, sir.

 9   Q   Did you ever ask anybody to be compensated

10       for this extra time?

11   A   I was told because of the position I was

12       holding as supervisor that there was -- that

13       I couldn't get comp time unless I worked --

14       if I worked, like, on a holiday and I would

15       come in and work, then I would get comp time

16       for that.  But other than that, any hour --

17       like, if I would come in a half hour early

18       or stay an hour late, I didn't get any comp

19       time for that, no, sir, because of the fact

20       that I was supervisor.

21   Q   But your classification was still an ASA-3?

22   A   Correct.

23   Q   Now, were you aware that there was a
```

1     difference in salary between an ASA-3 and a

2     division director?

3   A   No, sir.

4   Q   Did you feel that you should have been

5     compensated at a rate that a division

6     director should have been compensated at?

7   A   Sometimes, yes.  That thought had entered my

8     mind.

9   Q   Now, I want to -- Well, let me ask it this

10    way:  At what point, if you recall, did

11    things sort of calm down and everybody got

12    into a routine doing their responsibilities,

13    if you understand my position?

14  A   I am not quite understanding you -- the

15    content of your question.

16  Q   Yeah, let me rephrase it.  I ain't doing a

17    good job today of that.  I am thinking about

18    all the money I've got to spend for

19    Christmas.

20         You had indicated that -- or

21    testified that, you know, when you first

22    assumed this job, you were doing maybe a

23    couple of hours a day, you know, trying to

**Form 13**
Revised (1/1/1999)

# EMPLOYEE PERFORMANCE APPRAISAL
## STATE OF ALABAMA
### Personnel Department

Number of Steps

PLAINTIFF'S

Exhibit 12

Employee Name: **SHARON L VIOX**

Social Security Number:

Agency: **046/SECRETARY OF STATE**

Division:

Classification: **ADMIN SUPPORT ASST III**

Class Code: **10198**

Period Covered From: **01/01/2002**   To:   **01/01/2003**

Annual Raise Effective: **MARCH 2003**

---

***APPRAISAL SIGNATURES:*** Signatures are to be provided after the form has been completed.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN | | SSN |
| *Robena Jenkins* | *Sharon L Viox* | *Eleanor Swedenburg* |
| Signature | Signature | Signature |
| 4 Dec 02 | 12/4/02 | 12/5/02 |
| Date | Date | Date |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

***PERFORMANCE APPRAISAL SCORE:*** Locate the Responsibility Score on the back of this form and write it in the appropriate  space.  Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space.  The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

$$38.6 \quad - \quad 0 \quad = \quad 38.6$$

| Responsibility Score | Disciplinary Score | Performance Appraisal Score |
|---|---|---|

---

This employee's work:

| ☐ | ☐ | ☐ | ☐ | ☑ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 - 16.6) | Meets Standards (16.7 - 26.6) | Exceeds Standards (26.7 - 36.6) | Consistently Exceeds Standards ( 36.7 - 40 ) |

---

***WORK HABITS :*** Check the appropriate box for each work habit area.  If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period.   See the Disciplinary Actions area on the back of this form for disciplinary documentation.

| | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☑ | ☐ |
| Punctuality | ☑ | ☐ |
| Cooperation with Coworkers | ☑ | ☐ |
| Compliance with Rules | ☑ | ☐ |

**RESPONSIBILITIES:** List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| Responsibility | | Rating |
|---|---|---|
| 1. | Assists in coordinating telephone duty & training | 4 |
| 2. | Reserves corporate names | 3 |
| 3. | Explains & communicates filing procedures | 4 |
| 4. | Advises on request different filing fees | 4 |
| 5. | Enters data & posts different corporate filings | 4 |
| 6. | Maintains & coordinates archiving of files | 4 |
| 7. | Performs other assigned duties | 4 |
| 8. | | |
| 9. | | |
| 10. | | |

**RESPONSIBILITY SCORE:**

$$\underset{\text{Total of Responsibilities/Results Ratings}}{27} \div \underset{\text{Number of Responsibilities}}{7} = \underset{\text{Average Responsibility Rating}}{3.86} \quad x \quad 10 \quad = \quad \underset{\text{Responsibility Score}}{38.6}$$

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

_____

_____

_____

_____

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE: _____

PLAINTIFF'S
Exhibit 13
4689

Form 13
Revised (06/2005)

**EMPLOYEE PERFORMANCE *APPRAISAL***
**STATE OF ALABAMA**
**Personnel Department**

Employee Name: SHARON L VIOX          Social Security Number: 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

Agency: 046/SECRETARY OF STATE          Division: _____

Classification: ADMIN SUPPORT ASST III    Class Code: 10198    Position #: 04434502

Period Covered From: 01/01/03 To: 01/01/2004    Annual Raise Effective: MARCH 2004

---

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed. Signatures denote supervisor and employee discussion and receipt of form. Employee signature does not denote agreement. All signatures are mandatory.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN _____-6791 | | SSN _____-6791 |
| *Rater Signature* | *Employee Signature* | *Reviewer Signature* |
| 1/2/04 Date | 1/2/04 Date | 12/7/06 Date |
| Initial if comments attached | Initial if comments attached | Initial if comments attached |

---

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score. Mandatory documentation is to be maintained in the agency's personnel files if a "Does Not Meet" or "Consistently Exceeds" rating is given.

24.5 − 0 = 24.5

| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

This employee's work:

| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | ☒ Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 - 36.6) | Consistently Exceeds Standards (36.7 - 40) |
|---|---|---|---|---|

---

**WORK HABITS:** Check the appropriate space for each Work Habit area. Work Habits pertain to conduct occurring in this Appraisal period. Provide an explanation below for marking any work habit as "Unsatisfactory." Attach additional sheets if necessary.

| | Unsatisfactory | Satisfactory | |
|---|---|---|---|
| Attendance | | ✓ | |
| Punctuality | | ✓ | |
| Cooperation with Coworkers | | ✓ | |
| Compliance with Rules | | ✓ | |

**RESPONSIBILITIES:** List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

**Responsibility**                                                                                     **Rating**

1. _Supervises ..._                                                                                    2

2. _Communicates ..._                                                                                  2

3. _Trains ..._                                                                                        2

4. _Reviews ..._                                                                                       2

5. _Performs ..._                                                                                      3

6. _Scans ..._                                                                                         2

7. _Verifies ..._                                                                                      3

8. _Assists ..._                                                                                       3

9. _Explains ..._                                                                                      2

10. _Posts ..._                                                                                        3

11. _Performs ..._                                                                                     3

**RESPONSIBILITY SCORE:**

$$27 \div 11 = 2.45 \times 10 = 245$$

| Total of Responsibilities/Results Ratings | ÷ | Number of Responsibilities | = | Average Responsibility Rating | × | 10 | = | Responsibility Score |
|---|---|---|---|---|---|---|---|---|

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be documented below. Provide the number of disciplinary actions and steps taken with the employee during the appraisal year. If no disciplinary action has been taken, a "0" should be marked in each block provided. Attach a copy of the warning(s), reprimand(s), suspension(s) or demotion to the Appraisal.

| Warning | Reprimand | Suspension | Demotion |
|---|---|---|---|

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand, suspension, and demotion only. The Disciplinary Score does not include scores for counseling and warnings. To calculate the Disciplinary Score, identify the most severe step of discipline taken with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. If the most severe step taken with the employee in the appraisal year was one or more demotions, the Disciplinary Score will be 24. Otherwise, the Disciplinary Score will be 0.

**DISCIPLINARY SCORE:** ___ 0 ___

Sharon Viox

Supervises 9 personnel in posting foreign and domestic corporation documents, returning documents, name reservations, providing certificates of existence, copies and phone duty.

Communicates with customers in a professional fashion to resolve any problems with their requests with no valid complaints.

Trains personnel in all aspects of their different work requirements.

Reviews data entry and other tasks.

Performs the individual tasks on an as needed basis when employee is out.

Scans documents carefully making certain documents are legible and that documents can print out properly.

Verifies and takes name reservation requests so that the name is not deceptively similar or causes confusion with other names pursuant to title 10-2B-4.01 with minimal errors.

Assists with processing/creating and mailing name reservation requests and creates the certificate of name reservation as necessary with no errors or valid complaints.

Explains and communicates different corporate filings procedures on request so the customer has a complete understanding and information to successfully file the appropriate documents with no valid customer complaints.

Posts cash transactions properly coding each transaction so the deposit will reflect the correct information and balance properly with no errors.

Performs other assigned duties as instructed or explained so that the end result is accomplished without errors or customer complaints.